WO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Karen M. Baker,<br><br>　　　　　Plaintiff,<br><br>v.<br><br>Walgreens Arizona Drug Company,<br><br>　　　　　Defendant. | No. CV-15-00342-PHX-JAT<br><br>**ORDER** |

Pending before the Court is Defendant Walgreens Arizona Drug Company's motion for summary judgment.[1] (Doc. 34). Defendant's motion is in response to Plaintiff Karen Baker's Complaint alleging violations of Title VII of the Civil Rights Act of 1964, Title 42 U.S.C. § 2000e *et seq.* (2012), the Age Discrimination in Employment Act of 1967, Title 29 U.S.C. § 621 *et seq.* (2012) ("ADEA"), and a state-law claim of wrongful termination in violation of A.R.S. § 23-1501(A) (2014). (Doc. 1). The Court now rules on the motion.

**I.**

Plaintiff is an African American woman "over [forty] years of age" who began

---

[1] Neither party requested oral argument on the pending dispositive motion. Both parties have submitted memoranda discussing the law and facts in support of their positions and oral argument will not aide the Court's decisional process. *See e.g.*, *Partridge v. Reich*, 141 F.3d 920, 926 (9th Cir. 1998); *Lake at Las Vegas Investors Group, Inc. v. Pacific. Dev. Malibu Corp.*, 933 F.2d 724, 729 (9th Cir. 1991).

working as a Beauty Advisor[2] for Defendant at its Laveen, Arizona location ("the Store") "in March 2007." (Doc. 35 at 1). From the beginning of Plaintiff's employment through July 2014, the Store was managed by two individuals whose actions are not at issue in this case.[3] In July 2014, Mr. Luis Palomo[4] became the Store's Manager. In August 2014, Ms. Krystal Faultner was hired as the Store's Assistant Store Manager ("ASM"). (Doc. 35 at 2). As an ASM, Ms. Faultner was responsible for supervising and overseeing the "front-end"—or the sales floor of the Store—which included all Beauty Advisors and cosmetics department employees. (Doc. 35 at 2; Doc. 36 at 3). Ms. Faultner's job duties included "delegating tasks, creating schedules, planning staffing needs, interviewing, hiring and filling vacancies of front-end positions, and managing the performance of front[-]end positions," as well as "managing the performance of front[-]end employees, including disciplining employees."[5] (Doc. 35 at 2-3).

The record reflects nothing other than a benign employment relationship between Plaintiff and Defendant from her hire until June 2014. Plaintiff alleges that, beginning in June 2014, her schedule began to be reduced without explanation, and that younger, Hispanic workers were frequently given increases in scheduled hours at her expense. (Doc. 1 at 4). Then, on September 27, 2014, the events leading to Plaintiff's eventual termination were set in motion. During her shift, Plaintiff was working at the register "in

_____

[2] Plaintiff's job responsibilities included "working in the cosmetics department, merchandising, setting up products . . . ringing up customers, helping customers on the sales floor and assisting other employees." (Doc. 35 at 1).

[3] Plaintiff has not alleged that these Store Managers discriminated against her in any way.

[4] Plaintiff has alleged that only Mr. Palomo discriminated against her on the basis of age and race.

[5] Certain portions of the Court's recitation of facts are direct quotations from Defendant's Statement of Facts. (Doc. 35). The only portions directly transcribed are those facts that Plaintiff "agree[d] and stipulate[d]" to. (Doc. 36 at 2-3). Plaintiff did not file a contravening Statement of Facts.

the [c]osmetics department at the [Store] when, at approximately 1:46 p.m., a customer approached her register and initiated a transaction to purchase a six-pack of beer and one or two other items." (Doc. 35 at 15-16). "After Plaintiff scanned the beer and other items, the customer placed five one dollar bills on the register counter as partial payment for the items he planned on purchasing." (*Id.* at 16). "Plaintiff then picked up the cash, counted out the five one dollar bills and entered into the . . . register . . . that $5.00 had been tendered as partial payment." (*Id.*) After several of the customer's credit cards were declined in an attempt to cover the remainder of the transaction, the customer informed Plaintiff that "he was going to get cash out of the [ATM] that was located in the store and that he would return and" finish the transaction. (*Id.*). Plaintiff did not return the customer's money that had been tendered as partial payment. (*Id.*). Plaintiff then called for support from a "Store Floor Leader" to void the partial transaction, and placed the dollar bills under the six pack of beers that the customer had attempted to purchase. (*Id.*) "A little while later," Plaintiff "took the cash out from under the six pack of beer, folded the five one dollar bills in half and put them under the receipt printer by the register." (*Id.* at 16; Doc. 36 at 9).

Isabel, the Store Floor Leader who responded to Plaintiff's call for assistance at the cash register, saw Plaintiff place the dollar bills underneath the receipt printer, and then then informed Mr. Palomo of the incident. (Doc. 35-3 at 6-7). Plaintiff left the money under the receipt printer when she went home for the day; a second employee placed the dollar bills in an envelope with a note that the money belonged to Plaintiff and placed the envelope on Mr. Palomo's desk. (Doc. 35 at 17). Several days later, Plaintiff retrieved the envelope from Mr. Palomo. Plaintiff did not look inside to view the contents of the envelope, and did not inform Mr. Palomo that it contained a customer's money from the abandoned transaction. (*Id.* at 17-18). Finding Plaintiff's behavior "odd," Mr. Palomo reviewed the "Closed Circuit Television ("CCTV") video of the transaction that [Isabel] voided on September 27, 2014," and observed that Plaintiff had taken the dollar bills from the customer and placed them under the receipt printer. (Doc. 35-3 at 7).

1    Adhering to Defendant's corporate policy, Mr. Palomo contacted Duane Fletcher,
2    a Loss Prevention Manager for Defendant, to investigate the incident. (Doc. 35-3 at 8).
3    On October 2, 2014, Mr. Fletcher interviewed Plaintiff about the incident with Mr.
4    Palomo present. (Doc. 35-2 at 47-48). During the interview, Plaintiff recalled the
5    abandoned transaction with the customer, and stated that she gave the customer a five
6    dollar bill in exchange for the five one dollar bills, and then placed the dollar bills under
7    the receipt printer to "make a purchase" later. (*Id.* at 49-51). After Mr. Palomo and Mr.
8    Fletcher reviewed the CCTV footage with Plaintiff, Plaintiff "acknowledged that she did
9    not give any money back to the customer but could not provide an explanation as to
10   [why]." (*Id.* at 51). Plaintiff authored and signed a voluntary statement regarding the
11   incident and was permitted to return to work, but was informed that the investigation was
12   ongoing and that Mr. Fletcher and Mr. Palomo would meet with her again at its
13   conclusion. (*Id.* at 52).

14       On October 3, 2014, the customer from the abandoned transaction returned to the
15   Store and spoke with Mr. Palomo, confirming that Plaintiff never "offered to exchange
16   the five dollar bills for a single five-dollar bill." (Doc. 35-2 at 56). On October 7, 2014,
17   Plaintiff returned to Mr. Palomo the money from the incident,[6] telling Mr. Palomo that
18   she did not intend to take the money from the customer, and returned it "in good faith,
19   because [she] knew [she] didn't take it." (*Id.* at 56-57). Plaintiff acknowledged that she
20   failed to adhere to Defendant's "policy with respect to customer money handling," (*id.* at
21   59), and also acknowledged that she lied to Mr. Palomo and Mr. Fletcher, but felt that she
22   "was being pushed into" a "corner" on the issue. (*Id.* at 62-63).

23       Plaintiff's employment was thereafter terminated on October 15, 2014. (Doc. 35-3

---

25       [6] Plaintiff's deposition contains testimony that she sought out the customer from
26   the incident in order to return the five dollars by traveling "to his place of employment."
     (Doc. 35-2 at 61). Plaintiff did not disclose the date of her attempt to locate the customer
27   and has not further substantiated this claim, but acknowledged that until she viewed the
28   CCTV footage of the incident with Mr. Palomo, it was her "understanding" that she had
     made change for the customer. (*Id.* at 62).

at 10). Defendant maintains that the termination was based solely on "[Defendant's] investigation of her conduct relating to the September 27, 2014[,] customer transaction" and Defendant's "good cause" belief that Plaintiff had "knowingly taken property that did not belong to her, and knowingly made false and inaccurate statements" to Defendant during the investigation.[7] (*Id.*). Defendant's employee conduct policy lists "[d]ishonesty" as a form of serious misconduct that "may justify an employee's immediate dismissal, without prior warning," and "theft" is listed as a form of "gross misconduct" that is also grounds for immediate dismissal. (*Id.* at 13).

Following Plaintiff's termination, she filed a complaint with the Equal Employment Opportunity Commission ("EEOC"). (Doc. 1 at 7). The record contains documentation establishing that the EEOC investigated Plaintiff's complaint at some level, and on November 25, 2014, determined that "[b]ased upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes." (*Id.*). The EEOC further noted that the investigation "does not certify that the respondent is in compliance with the statutes," and that "[n]o finding [wa]s made as to any other issues that might be construed as having been raised by [Plaintiff's] charge." (*Id.*). On February 25, 2015, Plaintiff filed suit against Defendant.

Having set forth the pertinent factual and procedural background, the Court turns to Defendant's motion for summary judgment. (Doc. 34).

## II.

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of

---

[7] Plaintiff asserts that she "plans to offer testimony . . . to lay foundation that there was no violation of any duty Plaintiff owed [Defendant] on September 27, 2014. None of this purported testimonial evidence was included in the record, and it is not clear to the Court what Plaintiff means when she claims that she owed Defendant no "duty." (Doc. 36 at 12).

law." *Assurance Co. of Am. v. Wall & Assocs. LLC of Olympia*, 379 F.3d 557 (9th Cir. 2004) (citation omitted); *see also* Fed. R. Civ. P. 56(a). The movant bears the initial burden of demonstrating to the Court the basis for and the elements of the causes of action upon which the non-movant will be unable to establish a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the non-movant to establish the existence of a material fact in dispute. *Id.* The non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts" by "com[ing] forward with 'specific facts showing that there is a *genuine* issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (emphasis in original) (quoting Fed. R. Civ. P. 56(e) (1963) (amended 2010)). A dispute about a fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The non-movant's bare assertions, standing alone, are insufficient to create a material issue of fact and defeat a motion for summary judgment. *Id.* at 247–48. But in the summary judgment context, the Court construes all disputed facts in the light most favorable to the non-moving party. *Ellison v. Robertson*, 357 F.3d 1072, 1075 (9th Cir. 2004).

Plaintiff is pro se, and thus the Court "must liberally construe h[er] pleadings." *Franklin v. Murphy*, 745 F.2d 1221, 1235 (9th Cir. 1984) (citation omitted); *see also Boag v. MacDougall*, 454 U.S. 364, 365 (1982) (per curiam) (noting that federal courts should liberally construe the "inartful pleading" of pro se litigants); *Ashelman v. Pope*, 793 F.2d 1072, 1078 (9th Cir. 1986) (noting that courts in this Circuit should hold "pro se pleadings to a less stringent standard than formal pleadings prepared by lawyers"). But the Court need not undertake special endeavors to inform Plaintiff of her obligations under Rule 56. *See Karlozian v. Clovis Unified Sch. Dist.*, 8 Fed. Appx. 835, 836 (9th Cir. 2001) (citation omitted) (noting that the Ninth Circuit has held that "pro se litigants in the ordinary civil case should not be treated more favorably than parties with attorneys of record"); *see also Jacobsen v. Filler*, 790 F.2d 1362, 1366 (9th Cir. 1986) (noting that

"the present federal rules (particularly when amplified by local rules . . .) already apprise litigants of their summary judgment obligations"). It is proper to grant a defendant's motion where a pro se plaintiff fails "to present any evidence creating a genuine dispute of material fact as to whether [the] defendant violated" federal law. *Dang v. Solar Turbines, Inc.*, 452 Fed. Appx. 804, 805 (9th Cir. 2011) (citing *Bias v. Moynihan*, 508 F.3d 1212, 1218-19 (9th Cir. 2007)). But, "[a]s a general matter, the plaintiff in an employment discrimination action need produce very little evidence in order to overcome an employer's motion for summary judgment." *Diaz v. Eagle Produce, Ltd.*, 521 F.3d 1201, 1207 (9th Cir. 2008) (quoting *Chuang v. Univ. of Cal. Davis, Bd. of Trs.*, 225 F.3d 1115, 1124 (9th Cir. 2000)).

### III.

The Complaint contains three counts: (1) that Defendant discriminated against Plaintiff on the basis of race, in violation of 42 U.S.C. § 2000e-2(a)(1); (2) that Defendant discriminated against Plaintiff on the basis of age, in violation of 29 U.S.C. § 623(a)(1); and (3) that Defendant wrongfully terminated Plaintiff in violation of A.R.S. § 23-1501(A) (2014). Defendant seeks summary judgment on each of Plaintiff's federal claims.[8]

### A. Plaintiff's Title VII and ADEA Claims

The Complaint asserts that three actions[9] were taken against Plaintiff that were

---

[8] Having reviewed Defendant's motion for summary judgment, (Doc. 34), Defendant does not address a distinct, state-law claim for wrongful termination from the Complaint. The Court acknowledges that Plaintiff's pleadings present difficulties in terms of identifying exactly what claims have been brought. The Court, adhering to the doctrine that pro se pleadings are to be liberally construed, finds that Plaintiff raised a distinct "state law" claim for wrongful termination. (Doc. 1 at 4).

[9] The Complaint alleges that Defendant, through Mr. Palomo, "created a toxic environment to work in using his own polic[ies] and procedures," and that Mr. Palomo "willfully and knowingly use[d] discriminatory practices throughout Plaintiff's

discriminatory: (1) Plaintiff was "constantly overlooked . . . [for] job promotions[] that Plaintiff was well[-]qualified for"; (2) Defendant reduced Plaintiff's hours "while newly[-]hired Hispanic workers were constantly given increase[es] in hours" from June 2014 through October 2014; and (3) Plaintiff's termination. (Doc. 1 at 4-5). The Complaint appears to argue that each of these adverse employment actions were the result of discrimination on both the basis of age and race. Accordingly, the Court finds it most efficient to treat Plaintiff's Title VII[10] and ADEA[11] claims as one analysis premised on three separate factual allegations.

To prevail on a Title VII or ADEA claim, Plaintiff must first "establish a prima facie case of discrimination." *Vasquez v. County of Los Angeles*, 394 F.3d 634, 640 (9th Cir. 2003). A prima facie case is shown through "evidence that 'gives rise to an inference of unlawful discrimination,' either through the framework set forth in *McDonnell Douglas Corp. v. Green* or with direct or circumstantial evidence of discriminatory intent." *Id.* (citing *Cordova v. State Farm Ins. Cos.*, 124 F.3d 1145, 1148 (9th Cir. 1997)). Absent direct or circumstantial evidence establishing discriminatory conduct, both Title VII and ADEA claims are evaluated under the "threestage burden-shifting framework laid out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)." *Diaz*, 521 F.3d at 1207.

Plaintiff has failed to proffer any direct evidence[12] of racial or age discrimination.

---

employment." (Doc. 1 at 3-4). The record is completely devoid of evidence to support this claim. It is Plaintiff's responsibility to direct the Court to some "specific and triable facts." *Gordon v. Virtumundo, Inc.*, 575 F.3d 1040, 1058 (9th Cir. 2009) (citation omitted). Plaintiff has failed to do so, and the Court finds this allegation to be a "conclusory statement without factual support." *Surrell v. Cal. Water Serv.*, 518 F.3d 1097, 1103 (9th Cir. 2008) (citation omitted). The Court need not consider it further.

[10] "Title VII prohibits employers from discriminating against an individual based on race." *Surrell*, 518 F.3d at 1103 (citing 42 U.S.C. § 2000e-2(a)(1)).

[11] The ADEA makes it unlawful to terminate any individual due to that individual's age. 29 U.S.C. § 623(a)(1).

[12] Plaintiff's response argues that some evidence disclosed during discovery

Direct evidence is evidence that, "if believed, proves the fact of discriminatory animus without inference or presumption."[13] *Vasquez*, 349 F.3d at 640 (quoting *Godwin v. Hunt Wesson*, *Inc.*, 150 F.3d 1217, 1220 (9th Cir. 1998)). Plaintiff acknowledges as much, as she conceded that she never heard Mr. Palomo make any negative or derogatory remarks about Plaintiff herself, her age, or her race, and further acknowledged that no other employee ever told her that Mr. Palomo made derogatory or discriminatory comments about the aforementioned topics. (Doc. 35-1 at 16-18). Plaintiff also offered no documentary evidence and made no argument beyond the Complaint. Additionally, proffered circumstantial evidence—that Mr. Palomo acted with discriminatory intent via an alleged reduction in shifts and Plaintiff's termination following an incident involving mismanagement of customer funds—does not make out a prima facie case of discrimination. For example, Ms. Faultner was responsible for setting the schedules of front-end employees, including Plaintiff, and Plaintiff has not alleged that Ms. Faultner discriminated against her. (Doc. 35 at 2). Thus, Plaintiff's direct and circumstantial evidence is insufficient to "prove[] the fact of discriminatory animus without inference or presumption;" thus, for Plaintiff to prevail on summary judgment, she must survive under the *McDonnell Douglas* analysis.

Under the oft-cited *McDonnell Douglas* test, a plaintiff makes out a prima facie

---

contains "conflicting information that Defendant [does] not want examined at trial." (Doc. 36 at 13). Plaintiff has failed to include this evidence in the record, and the Court cannot consider what it cannot examine. Moreover, Plaintiff has failed to provide even a cursory explanation as to what this evidence is and how it supports denying summary judgment. Plaintiff also asserts that she submitted "work schedules" during discovery in support of her position. The Court has considered all work schedules that were included as part of the record by the parties. (*See* Doc. 35-4 at 14-59).

[13] Under the ADEA, direct evidence "is defined as evidence of conduct or statements by persons involved in the decision-making process that may be viewed as directly reflecting the alleged discriminatory attitude . . . sufficient to permit the fact finder to infer that that attitude was more likely than not a motivating factor in the employer's decision." *Enlow v. Salem-Keizer Yellow Cab Co.*, 389 F.3d 802, 812 (9th Cir. 2004) (quoting *Walton v. McDonnell Douglas Corp.*, 167 F.3d 423, 426 (8th Cir. 1999)).

case of unlawful discrimination where she can show that "(1) she belongs to a protected class, (2) she was performing according to her employer's legitimate expectations, (3) she suffered an adverse employment action, and (4) other employees with qualifications similar to her own were treated more favorably."[14] *Godwin*, 150 F.3d at 1220. If the plaintiff is successful, "then the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its allegedly discriminatory conduct." *Id.* If the defendant provides such a reason, then the burden shifts back to the plaintiff to demonstrate that the defendant's proffered reason is mere pretext for discrimination. *Vasquez*, 394 F.3d at 640 (citing *Cordova*, 124 at 1148). "Despite the burden shifting, the ultimate burden of proof remains always on the former employees to show that [the employer] intentionally discriminated" against them. *Coleman*, 232 F.3d at 1281.

The Court finds that Plaintiff satisfies the first element of the *McDonnell Douglas* test, as she belongs to a protected class for both Title VII and ADEA purposes.

### 1. The Senior Beauty Advisor Position

The first of Plaintiff's factual claims is that she was passed over "constantly" for "job promotions," and that "younger,"[15] less[-]qualified employees" were promoted "systematically."[16] (Doc. 1 at 4-5). The record makes clear, however, that Plaintiff felt

---

[14] In the context of an ADEA claim, Plaintiff must demonstrate that she was "(1) [a] member[] of the protected class (at least age 40); (2) performing [her] jobs satisfactorily; (3) discharged; and (4) replaced by [a] substantially younger employee[] with equal or inferior qualifications." *Coleman*, 232 F.3d at 1281 (citing *Nidds v. Schindler Elevator Corp.*, 113 F.3d 912, 917 (9th Cir. 1996)). Plaintiff may also satisfy the fourth element by establishing that she was "discharged under circumstances otherwise 'giving rise to an inference of age discrimination.'" *Diaz*, 521 F.3d at 1207 (quoting *Coleman*, 232 F.3d at 1281).

[15] Based on the structure of Plaintiff's claims, she appears to argue that she was passed over for promotions because of her age in violation of the ADEA. The Court, recognizing Plaintiff's pro se status, also incorporates the allegation into her Title VII claim.

[16] Plaintiff has produced no evidence that younger and less-qualified employees

aggrieved with respect to only a single alleged promotional opportunity: the Senior Beauty Advisor, a position that oversees the cosmetics apartment.[17] (Doc. 35-1 at 18-19). As a member of a protected class, Plaintiff must also show that "(2) she applied for a job for which she was qualified; (3) she was rejected; and (4) the position remained open and the employer sought other similarly-qualified employees." *Surrell*, 518 F.3d at 1105-06 (citation omitted).

Having reviewed the record, the Court finds that Plaintiff has proffered insufficient evidence to create a genuine issue with respect to whether she applied for a job for which she was qualified, and whether "the position remained open and the employer sought other similarly-qualified employees." Plaintiff failed to establish that the Senior Beauty Advisor position was ever vacant, that she spoke to management about a potential opening, or that she was passed over for "other similarly-qualified candidates."

Plaintiff began working at the Store as a Beauty Advisor in March 2007. When Plaintiff began her employment, Sandra was the Store's Senior Beauty Advisor. (Doc. 35 at 3). Sandra has been employed in that capacity for the intervening nine years, and is currently employed as the Store's Senior Beauty Advisor. (*Id.*). Plaintiff does not contest these facts. Rather, Plaintiff asserts that she "was told that the Senior Beauty Advisor position was open" by Sandra, and that Mr. Palomo asked Sandra "to step down." (Doc. 35-1 at 20). Plaintiff was "[n]ot real sure of the details of it, but that's just what was told to [her]." (*Id.*). Plaintiff also asserts that "another employee" told Plaintiff "that Mr. Palomo had offered the [Senior Beauty Advisor] position to her" after Sandra stepped

---

were hired and promoted "systematically." As noted *supra*, it is Plaintiff's responsibility to direct the Court to some "specific and triable facts." *Gordon*, 575 F.3d at 1058 (citation omitted). The Court finds this allegation to be a "conclusory statement without factual support," *Surrell*, 518 F.3d at 1103 (citation omitted), and need not consider it further.

[17] Plaintiff has proffered no evidence to suggest that she was passed over for any additional job opportunities. Plaintiff's deposition testimony readily acknowledges that she could only identify one position in which she felt discriminated against on the basis of age and race. (Doc. 35-1 at 18-19).

down.[18] (*Id.* at 21). Plaintiff felt that she had been discriminated against because of her race and her age, and that due to her seniority with Defendant, she "should have the right to be promoted." (*Id.* at 31).

The aforementioned factual assertions represent the entirety of Plaintiff's evidence. Nothing in the record suggests that Sandra stepped down or resigned from her position as Senior Beauty Advisor and she continues to work at the Store in the same capacity today. Nothing in the record substantiates Plaintiff's claim that Sandra was asked to step down or that the position was offered to another employee. Mr. Palomo and Ms. Faulter both denied under penalty of perjury that Sandra was ever asked to step down or that the position was offered to another employee. Moreover, Plaintiff never approached Mr. Palomo, the Store Manager, or Ms. Faultner, the ASM, about whether the position was indeed vacant or whether Plaintiff had interest in the position. Additionally, Ms. Faultner, as the Store's ASM, "would have been directly involved" with hiring Sandra's replacement if Sandra resigned from the Senior Beauty Advisor position. (Doc. 35-4 at 4). Ms. Faultner was never aware that Sandra was asked to step down, that she had stepped down, or that Mr. Palomo had offered the position to any other employee. More is required of Plaintiff.

The Court is aware of Plaintiff's modest burden to "produce very little evidence in order to overcome an employer's motion for summary judgment." *Diaz*, 521 F.3d at 1207 (citation omitted). But "conclusory statements without factual support are insufficient." *Surrell*, 518 F.3d at 1103 (citing *Nat'l Steel Corp. v. Golden Eagles Ins. Corp.*, 121 F.3d 496, 502 (9th Cir. 1997)). Here, Plaintiff has failed to show that there was an opening for the Senior Beauty Advisor position, or that she was passed over for promotion. The allegation does not make out a prima facie case of discrimination.

---

[18] During Plaintiff's deposition, the parties referenced a "journal" and hand-written documents that had been provided to Defendant by Plaintiff. (Doc. 35-1 at 23-25). The deposition transcript reveals that Plaintiff's testimony comports with what Plaintiff wrote in her "journal regarding [her] work at [the Store]." (*Id.* at 25). But this documentary evidence has not been entered into the record, and is not before the Court.

## 2. Alleged Reduction in Plaintiff's Hours Scheduled

Plaintiff acknowledges that Ms. Faultner was responsible for creating the work schedules of front-end employees, and that she did not allege that Ms. Faultner discriminated against her. (Doc. 35-1 at 39-40). Rather, Plaintiff asserts that Mr. Palomo, as the Store Manager and Ms. Faultner's supervising authority, convinced her to reduce Plaintiff's hours due to her age and race.[19]

Mr. Palomo became the Store Manager in July 2014.[20] (Doc. 35-3 at 2). Ms. Faultner became the ASM in August 2014 and set Plaintiff's work schedule in September and October 2014.[21] (*Id.* at 10). In the five months prior to Mr. Palomo's arrival, Plaintiff worked an average of 166.8 hours each month.[22] Once Mr. Palomo became Store Manager, Plaintiff worked 162 hours in July 2014, 159.5 hours in August, 130.75 hours in September, and from October 1 to October 15, 2014—Plaintiff's last day of employment—was scheduled to work 46.5 hours.[23] (Doc. 35-4 at 9-12).

Plaintiff has proffered no evidence to support her claim that her "hours were reduced while newly hired Hispanic workers were constantly given increase[s] in hours." (Doc. at 4). The Court must therefore examine the record to determine whether sufficient

---

[19] Specifically, Plaintiff alleges that "Ms. Faultner, under the direction of Mr. Palomo [and] being an assistant manager, had to follow certain rules that were directed by him, by Mr. Palomo." (Doc. 35-1 at 41).

[20] This fact is noteworthy, as Plaintiff alleges that her hours began to decline due to discrimination in June 2014.

[21] Plaintiff has not alleged that the ASM's at the Store prior to Ms. Faultner discriminated against Plaintiff by reducing her hours from February through August 2014.

[22] Plaintiff worked 160 hours in February 2014, 169.5 hours in March, 154 hours in April, 179.5 hours in May, and 171 hours in June. (Doc. 35-4 at 8-12).

[23] Plaintiff was scheduled to work 60.5 hours through October 17, 2014. (Doc. 35-4 at 57).

evidence exists to create a material factual dispute for trial. The Court begins with an analysis of the time frame Plaintiff alleges the discrimination took place. Plaintiff asserts that her hours were reduced in a discriminatory manner from June 2014 through October 2014. (*Id.*). Mr. Palomo did not become Store Manager at the Store until July 2014. (Doc. 35-3 at 2). Given that Mr. Palomo is the only employee that allegedly discriminated against her—and he did not work in the Store until July 2014—Plaintiff's hours in June 2014 are not probative of her claim, and will not be considered.

Turning to July 2014 and August 2014, the Court notes that Plaintiff worked 162 and 159.5 hours, respectively. (Doc. 35-4 at 8-10). Plaintiff's monthly totals falls within 4.5 and 7 hours, respectively, of her average monthly employment from February to June 2014. Moreover, the record establishes that Plaintiff was scheduled to work the second most hours among all cosmetics department employees at the Store. (*Id.* at 10). The only employee scheduled to work more during this time period was Sandra, who was a higher-ranking employee and whose seniority was at least comparable to Plaintiff's. Plaintiff has not pointed to any "newly hired Hispanic workers" who were scheduled to work more hours at Plaintiff's expense in July or August 2014. And Ms. Faultner, who Plaintiff alleged was the vehicle of Mr. Palomo's discrimination, did not set Plaintiff's schedule until September 2014. The Court finds no evidence to support Plaintiff's claim from June to August.

Proceeding out of chronological order, the Court next addresses October 2014, where Plaintiff was scheduled to work 46.5 hours from October 1 to October 15, 2014. Defendant acknowledges the reduction in hours, but asserts that "in late September or early October 2014, [Plaintiff] asked Mr. Palomo and [Ms. Faultner] for some time off in early October." (Doc. 35-4 at 12). "Per [Plaintiff's] request, she was given these additional days off, which resulted in her having less scheduled hours than usual." (*Id.*). Defendant's assertion is supported by Ms. Faultner's attestation, and a copy of Plaintiff's October 2014 schedule that includes a one-week period without any shifts scheduled. Plaintiff does not contest Defendant's assertion that she asked for time off. Plaintiff's

schedule included shifts on October 2, 3, 4, 5, 6, and then October 15, 16, and 17, 2014, suggesting that Plaintiff requested approximately one week of time off. (Doc. 35-4 at 57). During the week of October 2 to October 6, Plaintiff worked 39 hours. (*Id.*). Assuming that Plaintiff would have worked a similar number of hours[24] from October 7 to October 14, Plaintiff would have worked approximately 90 hours through October 17, 2014, and would have been on pace to work approximately 170 hours during the month. This estimate is on par with Sandra's schedule as Senior Beauty Advisor. (Doc. 35-4 at 12). Defendant's assertion is not supported by further documentary evidence, but Plaintiff has failed to contest the validity of Defendant's evidence. Absent any evidence to the contrary or any substantive argument from Plaintiff, the Court finds that Plaintiff's October 2014 schedule does not support her claim.

Finally, the Court turns to the September 2014 schedule where Plaintiff worked 130.75 hours. (Doc. 35-4 at 10). The Court notes that this is a precipitous drop in hours both from the prior month and from the average number of hours Plaintiff worked over the previous seven months,[25] and merits further scrutiny. Plaintiff, however, has failed to point to who the "newly-hired Hispanic workers" are who were given hours that should have been given to Plaintiff. The Court, therefore, has combed through the record and compiled a list of possible employees that Plaintiff may have been referring to. Based on the record provided by Defendant, the following employees may have been scheduled more often at Plaintiff's expense:

> Celeste A. (Employed from November 2013 to August 2014)
> Chelsea A. (Hired on or about June 12, 2014)

---

[24] The Court acknowledges that this is not a perfect calculation, and it is not intended to be a representation of the exact number of hours that Plaintiff was scheduled to work in October 2014. The Court is merely conducting as thorough an analysis as possible of Plaintiff's claim based on the record before it. The Court has been given no reason to suspect that Plaintiff's hours would have fluctuated substantially from one week to the next. Moreover, Plaintiff has not argued that her schedule during this week would have been substantially different from the prior week.

[25] From February 2014 to August 2014, Plaintiff worked an average of 165 hours.

- 15 -

Amanda G. (Hired on or about September 12, 2014)
Asia T. (Hired on or about September 15, 2014)
Dezerae L. (Hired on or about July 2014)
Martha C. (Hired on or about February 20, 2014)
Sandra C. (Hired on or about August 5, 2011)[26]

(Doc. 35-4 at 14-16). As noted *supra*, during the month of September, Plaintiff worked 130.75 hours. Celeste A. worked 130 hours in July 2014, 63 hours in August 2014, and no longer worked for Defendant in September 2014. Chelsea A. worked 96.25 hours in September 2014. Amanda G. worked 57 hours in September 2014. Asia T. worked 55.25 hours in September 2014. Dezerae L. worked 106 hours in September 2014. And Martha C. worked 59 hours in September 2014. (*Id.* at 18-59). In the interest of thorough analysis, the Court has expanded its examination to include hours scheduled for October 2014. Plaintiff was scheduled to work 46.5 hours through the first half of the month, but had requested up to a week of time off. Between October 1 and October 15, 2014, Chelsea A. was scheduled to work 67.75 hours, Dezerae L. was scheduled to work 91.75 hours, and Sandra M. was scheduled to work 84.5 hours. (*Id.* at 12, 18-59). Absent her week off, Plaintiff would have been schedule to work approximately 80[27] hours through the first half of October.

Having reviewed the record, the Court finds that one data point, at least initially, supports Plaintiff's contention: her September 2014 work schedule. September saw a noticeable dip in the hours Plaintiff was set to work, falling from 159.5 hours to 130.5 hours. (Doc. 35-4 at 10). Defendant describes the drop in hours as being due to Ms. Faultner needing to make "slight changes" to the schedule in order to ensure that the

---

[26] Sandra C. was transferred "to another store" in "the late summer of 2014"). (Doc. 35 at 4). She was scheduled to work 156.5 hours in May 2014, and 166 hours in June, and was "not scheduled to work in the cosmetics department in July 2014." (Doc. 35 at 12).

[27] Plaintiff was scheduled to work a total of 14 hours on October 16 and October 17, 2014. (Doc. 35-4 at 57). So, while she was scheduled to work a total of approximately 90 hours through October 17, through the "first half" of the month—October 15—her approximate total is closer to 80 hours.

Store "was following [Defendant's] scheduling policies and that evening and weekend shifts were fairly distributed among the employees." (*Id.* at 6). The Court is not persuaded by Defendant's explanation that a "slight change" accounted for this drop in hours. But, at the same time, the Court recognizes Defendant's position that "[n]o employee is guaranteed a set schedule" and that "schedules may vary based on business needs." (Doc. 35-4 at 6). Moreover, Plaintiff's September schedule contained roughly the same number of hours as Sandra, a similarly senior employee working in Defendant's cosmetics department.[28] (*Id.* at 10-11). And month-to-month fluctuations in other employee's schedules show that a substantial change in the number of hours worked is not unique to Ms. Baker's September 2014 calendar.[29] Finally, none of the newly hired employees identified by the Court experienced a spike in hours in September 2014 at Plaintiff's expense. Standing alone, the Court does not find that the drop in Plaintiff's hours—isolated to September 2014—is sufficient to make out a prima facie claim of discrimination.

Plaintiff does not contest the factual assertion that ASMs, and not Store Managers, are "solely responsible for creating and drafting" her schedule, (Doc. 35-4 at 5), and she has failed to offer even a hint of evidence that Mr. Palomo had some influence over the creation of employees' schedules, or that he in some way influenced or instructed Ms. Faultner to diminish Plaintiff's work schedule on the basis of age or race. Coupled with Plaintiff's inability to show that her hours were cut in favor of increasing the hours of young, Hispanic workers, the Court finds that Plaintiff has failed to create a genuine issue of material fact for trial.

---

[28] Sandra, the Senior Beauty Advisor for nine years, was scheduled to work 130.5 hours in August 2014 and 130.5 hours in September 2014. (Doc. 35-4 at 10-11).

[29] For example, Celeste A. was scheduled to work 130.5 hours in July 2014 and 63 hours in August 2014. (Doc. 35-4 at 10). Sandra was scheduled to work 180 hours in July 2014 and 130.5 hours in August 2014 and 130.5 hours in September 2014. (*Id.*). Celeste A. was also scheduled to work 147.5 hours in April 2014 and 98 hours in May 2014. (*Id.* at 9).

### 3. Plaintiff's Termination

Plaintiff's final factual allegation in support of her claim is that she was terminated on October 15, 2014, due to her age and race. The Court notes that the Complaint does not directly assert this claim. Rather, Plaintiff alleges that Defendant "[t]erminated her employment against state law"; (Doc. 1 at 4); the Complaint never states that it was on the basis of race or age. Nonetheless, liberally construing Plaintiff's pleadings, *Franklin*, 745 F.2d at 1235 (citation omitted), the Court will analyze a claim of age and racial discrimination via Plaintiff's termination.

Plaintiff must first make out a prima facie case in order to shift the burden to Defendant to offer a nondiscriminatory reason for her termination. *Godwin*, 150 F.3d at 1220. The Court has already found that Plaintiff belongs to a protected class under both Title VII and the ADEA. Plaintiff clearly suffered an adverse employment action, as she was terminated, and no evidence suggests that Plaintiff failed to perform according to Defendant's legitimate expectations.[30] *Id.* Plaintiff, however, must still demonstrate that "other employees with qualifications similar to her own were treated more favorably."[31]

---

[30] The Court finds that the proper scope with respect to this element is whether Plaintiff was adequately performing her job duties prior to Defendant's internal investigation. Plaintiff's job responsibilities included "working in the cosmetics department, merchandising, setting up products . . . ringing up customers, helping customers on the sales floor and assisting other employees." (Doc. 35 at 1). Defendant has offered no evidence suggesting Plaintiff had shortcomings in these areas, and the record reflects seven years of employment without issues related to her work product.

[31] Under the ADEA, Plaintiff must also establish that she was "replaced by [a] substantially younger employee[] with equal or inferior qualifications." *Coleman*, 232 F.3d at 1281 (citation omitted), or that she was "discharged under circumstances otherwise 'giving rise to an inference of age discrimination.'" *Diaz*, 521 F.3d at 1207 (citation omitted). Even analyzing Plaintiff's prima facie claim with ADEA specific language, the record contains no evidence that Plaintiff was replaced by someone substantially younger, or that the circumstances give rise "to an inference of age discrimination."

*Id.*

   "The requisite degree of proof necessary to establish a prima facie case for Title VII . . . on summary judgment is minimal and does not even need to rise to the level of a preponderance of the evidence." *Godwin*, 150 F.3d at 1220 (quoting *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir. 1994)); *Yartzoff v. Thomas*, 809 F.2d 1371, 1375 (9th Cir. 1987) (citation omitted) (noting that "[a]t the summary judgment stage, the prima facie case need not be proved by a preponderance of the evidence"); *see also Sischo-Nownejad v. Merced Cmty. College Dist.*, 934 F.2d 1104, 1110 (9th Cir. 1991) (superseded by statute on other grounds) (noting that "[t]he amount [of evidence] that must be produced in order to create a *prima facie* case is 'very little'"). "Plaintiff need not plead specific facts that establish this element of the prima facie case as long as other factual allegations in the pleading can lead to a plausible inference that other employees with qualifications similar to her own were treated more favorably." *Washington v. Certainteed Gypsum*, *Inc.*, No. 2:10-cv-00204-GMN-LRL, 2011 U.S. Dist. LEXIS 94920, at *19 (D. Nev. Aug. 24, 2011). And "[n]ormally, when such evidence has been introduced, a court should not grant summary judgment to the defendant on any ground relating to the merits." *Sischo-Nownejad*, 934 F.2d 1104, 1110 (9th Cir. 1991) (quoting *Lowe v. City of Monrovia*, 775 F.2d 998, 1009 (9th Cir. 1985)).

   Having thoroughly reviewed the record, Plaintiff has not offered—and the Court cannot find—any evidence that "other employees with qualifications similar to her own were treated more favorably." The Court has identified two possible analyses to determine whether Plaintiff was treated less favorably than other employees. The first, broader analysis is whether African Americans or employees over the age of forty were more frequently targeted by Defendant for "investigations" of workplace behavior than other employees who do not belong to either of the aforementioned protected classes. The second, narrower analysis is to determine whether Plaintiff was terminated following her internal investigation but other employees outside her protected classes were punished less severely after being found to have violated similar policies. In the instant matter, the

distinction is unimportant. Under either analysis, the record before the Court is devoid of evidence showing that Plaintiff was treated less favorably. As mentioned *supra*, Plaintiff has failed to compile any record to resist Defendant's motion, and failed to file a contravening Statement of Facts. Even taking into account the facts pleaded in the Complaint and Plaintiff's response to the pending motion, no facts assert—even in a conclusory manner—that other employees were treated more favorably than she was. Nor do "other factual allegations" lead to the "plausible inference that other employees with qualifications similar to her own were treated more favorably." *Washington*, 2011 U.S. Dist. LEXIS 94920, at *19. Absent *any* evidence in the record, or even in her filings, Plaintiff cannot make out a prima facie case of discrimination under *McDonnell Douglas*.

The Court's finding is bolstered by evidence offered by Defendant. On September 18, 2014, Mr. Palomo contacted Mr. Fletcher and asked him to initiate an internal investigation of a separate employee following an incident of suspected theft. (Doc. 35 at 24). The employee in question did not belong to either of Plaintiff's protected classes under Title VII or the ADEA. (Doc. 35-3 at 11). The incident involved a "photo specialist" who had "printed a poster in the photo department" and then "left the store without paying for it" and subsequently "engaged in intentionally deceitful conduct to cover up what he did." (*Id.* at 10-11). During Mr. Fletcher's interview, the photo specialist "admitted to taking the poster and engaging in dishonest conduct" and was terminated on September 23, 2015. (*Id.*). "The value of the poster was nineteen dollars." (*Id.* at 10). Plaintiff does not challenge the veracity of these assertions, which support Defendant's position that it is standard "policy to terminate employees whenever there is a reasonable belief that the employee intentionally engaged in a dishonest act." (*Id.* at 10). While this policy may appear harsh in light of the amounts involved in each incident, the available evidence suggests that the policy is applied uniformly to all employees, and that Plaintiff was not treated less favorably because of her race or her age. Even absent this evidence, the Court reiterates that Plaintiff has not presented any evidence showing

1   that under either analysis, other employees were treated more favorably than Plaintiff.[32]

2   The result is that the record contains insufficient evidence to make out a prima facie case

3   of discrimination.

4        The Court is keenly aware of the Ninth Circuit's pronouncement that Plaintiff's

5   burden is "minimal" to establish a prima facie case of discrimination. *Coburn*, 372 Fed.

6   Appx. at 798; *Diaz*, 521 F.3d at 1207 (citation omitted); *Godwin*, 150 F.3d at 1220;

7   *Wallis*, 26 F.3d at 889.   The Court also remains cognizant of its responsibility to

8   "liberally construe" Plaintiff's pleadings. *Franklin*, 745 F.2d at 1235 (citation omitted).

9   But the Court may not create out of whole cloth evidence that does not exist in the record

10  to satisfy Plaintiff's modest burden under *McDonnell Douglas*. The Federal Rules of

11  Civil Procedure and the Local Rules for the District of Arizona apprise civil litigants of

12  their obligations at the summary judgment phase. *Karlozian*, 8 Fed. Appx. at 836;

13  *Jacobsen*, 790 F.2d at 1366. Plaintiff must point to *some* evidence in the record to show

14  that other employees were treated more favorably than her. Although not required to, the

15  Court has combed through the record in search of evidence to support Plaintiff's claim.

16  *See Bias v. Moynihan*, 508 F.3d 1212, 1219 (9th Cir. 2007) (noting that "[a] district court

17  lacks the power to act as a party's lawyer, even for *pro se* litigants" and that it "does not

18  have a duty to search for evidence that would create a factual dispute"); *Carmen v. S.F.*

19  *Unified Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001) (recognizing that it would be

20  "unfair" to the district court to require it "to search the entire record" if a party fails to

21  "disclose where in the record the evidence for [the factual claims] can be found").

22       Plaintiff has simply failed to produce even a modicum of evidence to support her

23  claim that other similarly situated employees were treated more favorably than she was,

24  and in light of this record, the Court will grant Defendant summary judgment on this

25  issue. *See Dang*, 452 Fed. Appx. at 805 (citation omitted) (noting that it is proper to grant

26  _____

27  [32] As discussed *supra*, Plaintiff admitted during the internal investigation that she
    failed to adhere to Defendant's "policy with respect to customer money handling," (Doc.

28  35-2 at 59), and also acknowledged that she lied to Mr. Palomo and Mr. Fletcher, but felt
    that she "was being pushed into" a "corner" on the issue. (*Id.* at 62-63).

summary judgment against a pro se plaintiff where she fails "to present any evidence creating a genuine dispute of material fact as to whether [the] defendant violated" federal law); *Coburn v. PN II*, 372 Fed. Appx. 796, 799 (9th Cir 2010) (finding sufficient evidence to make out a prima facie Title VII claim where the plaintiff proffered some evidence that similarly situated male employees were treated more favorably then female employees); *Bias*, 508 F.3d at 1218-19 (affirming summary judgment where the pro se plaintiff failed to present "any evidence to support her opposition"); *Best v. Cal Dep't of Corr.*, 21 Fed. Appx. 553, 558 (9th Cir. 2001) (finding insufficient evidence to make out a prima facie disparate treatment case where the plaintiff "failed to provide any evidence that" similarly situated employees were treated more favorably "or, in fact, any evidence beyond mere allegation" and that "given the multitude of avenues available to [the plaintiff], [her] failure to provide evidence of disparate treatment beyond her own bare assertions are fatal to [her claim]").

The Court has analyzed the three factual allegations that form the basis of Plaintiff's Title VII and ADEA clams. With respect to each allegation, Plaintiff has failed to proffer sufficient evidence to overcome summary judgment. Again acknowledging Plaintiff's very modest burden in cases of discrimination, *Diaz*, 521 F.3d at 1207 (citation omitted), Defendant is nonetheless entitled to summary judgment on Plaintiff's Title VII and ADEA claims.

**B. Plaintiff's Wrongful Termination Claim**

Having adjudicated Plaintiff's federal claims, the Court turns to the final count of the Complaint, a state-law claim for "wrongful termination." Plaintiff alleges that Defendant "[t]erminated her employment against state law," as it "[w]illfully and knowingly fabricated a lie and accused Plaintiff of theft." (Doc. 1 at 5). Defendant did not move for summary judgment on this state-law claim, but did note in its Answer that "[d]ue to the vague allegations in Plaintiff's Complaint," Defendant was unsure as to "whether this [claim] arises out of the same conduct alleged" in Plaintiff's federal claims.

(Doc. 9 at 2 n.2). Defendant further "reserve[d] the right to seek dismissal of [Plaintiff's state-law claim] because such allegations, even if true, are not sufficient to state a claim for relief under either Arizona statutory or common law." (*Id.*).

The United States Court of Appeals for the Ninth Circuit has upheld the district court's exercise of discretion in declining to exercise supplemental jurisdiction under Title 28 U.S.C. § 1367 (2012) over a state-law claim when all federal claims have been dismissed for failure to state a claim or where a grant of summary judgment for the defendant has been entered. *Trustees of Constr. Indus. & Laborers Health & Welfare Trust v. Desert Valley Landscape & Maint., Inc.*, 333 F.3d 923, 926 (9th Cir. 2003) (citations omitted). In each case, the Ninth Circuit "held it appropriate for the district court to decline jurisdiction over the pendent state claims because there was no viable federal claim." *Id.*

A question remains as to whether the Court has independent jurisdiction to hear this purely state-law claim under Title 28 U.S.C. § 1332 (2012), or whether jurisdiction hinges on 28 U.S.C. § 1367. Accordingly, the Court orders further briefing on the issue. Both parties shall file a brief, not to exceed four pages in length, addressing the issue of subject matter jurisdiction regarding Plaintiff's state-law claim. The briefs shall be filed no later than Friday, April 8, 2016.

**IV.**

To conclude, the Court finds that Defendant is entitled to summary judgment on Plaintiff's Title VII and ADEA claims. The Court also orders additional briefing on the issue of whether subject matter jurisdiction exists to hear Plaintiff's wrongful termination claim under 28 U.S.C. § 1332.

For the aforementioned reasons,

**IT IS ORDERED** that Defendant's motion for summary judgment on Plaintiff's Title VII and ADEA claims, (Doc. 34), is hereby **GRANTED**.

1    **IT IS FURTHER ORDERED** that the parties shall file briefs as specified above

2  on the issue of whether jurisdiction continues for the Court to hear Plaintiff's state-law

3  claim no later than Monday, May 2, 2016.

4    Dated this 18th day of April, 2016.

James A. Teilborg
Senior United States District Judge